[Civ. No. 15724. Second Dist., Div. One. Sept. 8, 1947.]

MRS. F. A. GRIFFITH, Respondent, v. GEORGE M. BUCKNAM, Appellant.

Edward Payson Hart, Horace Heffernan, Wallace Trau, Davies & Abbey and James B. Abbey for Appellant.

Neil S. McCarthy, Charles R. Thompson and Neil Dillon McCarthy for Respondent.

WHITE, J.—Defendant has appealed from a judgment awarding plaintiff $10,000 damages for the loss of her stallion, "Sarada," which died as the result of injuries received while at stud on the farm of defendant. Plaintiff's complaint contained two causes of action, the first of which was based upon an alleged oral agreement whereby plaintiff leased the stallion to defendant to be bred to thoroughbred mares, with the express provision "that defendant would affix to each of the mares so bred to said stallion Sarada, an effective hobble-harness before and during the process of breeding her in order

that she would be unable to kick said stallion." In her second cause of action, predicated upon negligence, plaintiff alleged that it was the accepted practice in the breeding of thoroughbreds to affix an effective hobble-harness to the mare to prevent her from kicking the stallion. In each cause of action plaintiff further charged that defendant failed to use such hobble-harness in breeding a mare to said stallion; that as a result the mare was able to and did kick the stallion, breaking his leg and causing his death.

After trial without a jury, the court found that the allegations of plaintiff's first cause of action were true, and as to the second cause of action found that while some breeders used the hobble-harness as a regular practice, others did not, leaving it to the judgment of the particular person handling the breeding at the time, and that more breeders used the harness than did not; but that irrespective of any custom or practice, "under the facts and circumstances existing at the time of the breeding or attempt to breed the said mare to the said stallion Sarada it was negligence on defendant's part not to use hobble harness on said mare."

The defendant owned and operated a breeding farm in San Diego County. On December 16, 1944, the plaintiff, Mrs. Griffith, wrote to defendant from Hot Springs, Arkansas, "I am thinking of returning my Stallion 'Sarada' by Sir Galahad III to Cal. to the stud, and I am wondering if you would be interested in standing him for me—or perhaps you might like to buy him. . . . If you are not interested and know of someone else who may be, I would certainly appreciate hearing from you. . . ." In response, the defendant wrote to Mrs. Griffith: "I might be interested in standing the horse for you this coming season with an option to purchase him. If this arrangement is made, could you ship him to the farm in plenty of time for the 1945 season?" The plaintiff replied on or about January 4, 1945, as follows:

". . . I am asking $7,500.00 for him and I believe that if conditions were normal that I could get twice as much for him. I would lease him for $2,500.00 per year (with the privilege of 30 mares). I should think that many owners would be interested in breeding mare and fillies which they had intended to run.

"I believe that Sarada should get plenty of mares at a fee of $250.00.

"I would appreciate hearing from you. . . ."

Under date of January 9, 1945, Mr. Bucknam wrote Mrs. Griffith as follows:

"Your letter of January 4th received.

"I will stand the horse 'Sarada' in California if you will accept as compensation, all outside stud fees up to $2500.00 for the season. I to have the option of paying instead the $7500.00 you ask for him. Payment to be made by September 1st, 1945. Also, I shall have the privilege to breed a few of my mares at no fee. . . . If you are interested in the above arrangement please write me confirmation at once so I can arrange a full page ad announcing the return of the horse in the January issue of The California Breeders Magazine. . . ."

Upon receipt of this letter plaintiff did not wire defendant, but talked with him by long distance telephone on January 14, 1945. The pertinent portions of plaintiff's testimony regarding this conversation are as follows:

"I said, 'Mr. Bucknam, I read your letter regarding Sarada and although you asked me to wire you I am calling because even though your terms which you mention as to payment of Sarada are satisfactory, there are some other things which I would have to discuss, and some further agreements which have to be made before I can tell you that I will ship Sarada to you.'

"He said, 'All right, Mrs. Griffith, what are they?' I said, 'First, do you live at your ranch?'

"He said, 'Yes, I do.'

"I said, 'Then you would see Sarada every day?'

"He said, 'Oh, yes.'

". . .

"And I said, 'Do you have breeding hobbles?'

"He said, 'Yes, I have.'

"And I said, 'In the event I ship Sarada, do you agree to hobble all mares which you breed to Sarada?'

"He said, 'Yes, Mrs. Griffith, I do.' . . ."

Mrs. Griffith shipped her horse to defendant on January 18, 1945. On February 6, 1945, while employees of defendant were attempting to breed the mare "Show Card" to the stallion, the mare kicked the stallion, breaking his leg, with the result that he died on February 18, 1945. No contention is made by appellant that the trial court was not justified in finding, in accordance with Mrs. Griffith's testimony, as well as some corroborative testimony, that the defendant orally

agreed to use hobbles on the mares bred to Sarada and that no hobbles were being used at the time of the kicking incident.

Appellant's first ground for reversal is that the judgment "either ignores or tortures the parol evidence rule, which is a rule of substantive law and not merely a rule of evidence." This contention will be considered together with appellant's third point, that the contract was written and could not be varied by parol evidence. Neither of these contentions can be sustained. The exchange of correspondence between the parties did not alone bring a contract into existence, for there was no meeting of the minds. It is apparent from a reading of the letters above quoted that there could be no contract until the offer contained in defendant's letter of January 9, was accepted by the plaintiff. According to plaintiff's testimony, she did not unqualifiedly accept the offer of January 9, when she telephoned defendant, but instead made a counteroffer containing an additional condition or promise—that Mr. Bucknam should use a hobble-harness on the mares bred to Sarada. The situation, therefore, was one in which a written offer was followed by an oral counteroffer and an oral acceptance of the counteroffer; or, to put it another way, plaintiff's oral acceptance of defendant's offer was conditional, and defendant in turn acceded to the condition proposed by the plaintiff. A contract may be partly oral and partly written. (17 C.J.S. 409.) "Where a proposal in writing is made and accepted it is permissible to show that it was accepted with conditions or qualifications, or that accompanying the acceptance and in reality forming a part of it, terms in addition to those set forth in the proposal were exacted by the acceptor." (*Scott Co., Inc.* v. *Rolkin*, 133 Cal.App. 209, 212 [23 P.2d 1065].) The language employed in *Lawrence* v. *Premier Indem. Assur. Co.*, 180 Cal. 688, 698 [182 P. 431], is pertinent here: "Because of the fact that the writing is a proposal merely, something more must be shown before it can be considered that there is a contract. That something is an acceptance, and the acceptance is just as much a part of the contract as the proposal, and anything which is a part of the acceptance may be shown, even though the proposal be in writing and the acceptance be not. So far as the 'parol evidence' rule goes, the essential distinction between a writing which purports to be a proposal merely and one which

purports to be the contract of the parties is that the first does not purport to be the written memorial of both parties as to their understanding and the second does, with the necessary result that in the latter case, but not in the former, the writing and nothing else is to be taken as expressing the contract. It follows that in the present case it was permitted to the defendants to show that their acceptance of the plaintiff's written proposal was conditional. . . ."

It is argued by appellant that all of the elements of a contract appear from the letters of January 4 and January 9. To the contrary, Mrs. Griffith's letter of January 4, contained an offer to lease the stallion for $2,500 per year and suggested a stud fee of $250. Defendant's letter of January 9 proposed that Mrs. Griffith accept "all outside stud fees up to $2500.00 for the season." Nor did defendant agree to purchase Sarada for $7,500. Instead he asked for an option to purchase, good until September 1, 1945, and further, that should he exercise the option he should retain all stud fees.

The conclusion at which we have arrived upon this phase of the appeal renders it unnecessary to consider appellant's contention that the finding of negligence upon the second cause of action is unsupported by the evidence, particularly in view of the court's finding that no general custom existed with respect to the use of a hobble-harness.

It is next asserted that the parties were engaged in a joint venture, and for that reason they should share equally the losses as well as the profits from the transaction. The authorities cited by appellant do not support the view that the parties were joint venturers. The elements of a joint enterprise are not here present. There was no joint participation in the conduct of the business, no agreement to share profits or losses with respect thereto, nor any "joint proprietary interest and right of mutual control over the . . . property engaged therein." (*Parker* v. *Tefry*, 58 Cal.App.2d 69 [136 P.2d 55].) (See, also, *Freedman* v. *Industrial Acc. Com.*, 67 Cal.App.2d 629 [154 P.2d 922].)

There remains to be determined the question of whether or not the trial court properly allowed to the plaintiff as damages the sum of $2,500 for loss of stud fees, in addition to the sum of $7,500 representing the value of her stallion. In this we think the trial court erred. The sum of $7,500 represents the value placed upon her property by the

plaintiff herself in her contract with the defendant, and reasonable value at the time of loss is the measure of damages for the loss or destruction of such personal property. By the terms of the contract the defendant could, at any time up to September 1, 1945, relieve himself from the obligation to pay over the first $2,500 of stud fees collected by exercising his right to acquire the stallion at the price fixed by plaintiff, $7,500. To award plaintiff these anticipated earnings, on the theory that the defendant would not have exercised his option, would be to allow damages for loss of profits, the realization of which was wholly contingent upon a decision by defendant as to whether he wished to acquire the horse. Plaintiff, as well as defendant, is bound by the terms of the contract, and under the contract she cannot complain if she receives what she agreed to accept—that is, the value of the stallion.

The judgment is modified by reducing the principal amount thereof from $10,000 to $7,500, and as so modified the judgment is affirmed, neither party to recover costs of appeal.

York, P. J., and Doran, J., concurred.